IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ASHLEY R. MAYS                                                               PLAINTIFF

      v.                                     CIVIL NO. 15-2105

CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration                                               DEFENDANT

## **MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Ashley R. Mays, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claims for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) under the provisions of Titles II and XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

**I.     Procedural Background:**

Plaintiff protectively filed her current application for DIB and SSI on September 4, 2012, alleging an inability to work since August 3, 2011,[1] due to bipolar disorder and knee problems. (Tr. 57-58, 69-70). For DIB purposes, Plaintiff maintained insured status through December 31, 2015. (Tr. 57, 60). An administrative hearing was held on June 27, 2013, at

---

[1] The Court notes Plaintiff had prior applications for benefits that were denied at the administrative level on August 23, 2012. The denial of benefits was affirmed by Federal Court. Mays v. Colvin, 2013 WL 6157876 (W. D. Ark. Nov. 25, 2013). This would mean Plaintiff's alleged onset date could not be before August 24, 2012.

1

which Plaintiff appeared with counsel and testified. (Tr. 26-50). Sarah Moore, a Vocational Expert (VE), also testified. (Tr. 50-52).

In a written opinion dated February 21, 2014, the ALJ found that Plaintiff's bipolar disorder was a severe impairment. (Tr. 11). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairment did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 12). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform the full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform simple, routine, repetitive tasks in a setting where interpersonal contact is incidental to the work performed, and she can work under supervision that is simple, direct, and concrete. (Tr. 13). The ALJ determined that Plaintiff had no past relevant work; however, based on her age, education, work experience and RFC, the ALJ determined that there were jobs that exist in significant numbers in the national economy that she could perform. (Tr. 17). Ultimately, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act from August 3, 2011, her alleged onset date, through February 21, 2014, the date of the decision. (Tr. 18).

Subsequently, on March 4, 2014, Plaintiff requested a review of the hearing decision by the Appeals Council. (Tr. 4-5). Her request was denied on April 30, 2015. (Tr. 1-3). Plaintiff filed a Petition for Judicial Review of the matter on June 2, 2015. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 13, 14).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

## II.     Evidence Submitted:

At the hearing before the ALJ on June 27, 2013, Plaintiff testified that she was born in 1983, and had a high school education. (Tr. 27, 30).

A review of the medical evidence reflects the following. On July 22, 2010, Plaintiff underwent a consultative mental diagnostic evaluation by Robert L. Spray, Jr., Ph.D. (Tr. 297-301). During that evaluation, Plaintiff reported that she had been "mean and really angry" and sometimes "yell[ed] at her son." Dr. Spray noted that Plaintiff was working at Sam's Club as a cashier, but noted she was also assigned other jobs. Plaintiff reported that she had a ten-year-old son, and although she had tried to live independently, they were currently living with Plaintiff's mother. Plaintiff also reported that all she wanted to do was sleep and some days just lie in bed and cry. Plaintiff reported that since she started her medication, she had not had nightmares. Dr. Spray estimated Plaintiff's cognitive functioning to be in the range of 75-80. Dr. Spray noted that Plaintiff communicated adequately, but in somewhat of a child-like voice. Plaintiff reported having friends with whom she went out to eat and to the movies. Dr. Spray noted that Plaintiff appeared to have some difficulty with immediate short-term memory. Plaintiff was noted to have fairly good attention and concentration. She persisted well during the examination; however, Dr. Spray noted Plaintiff might not be able to be as consistent in a job setting. Plaintiff exhibited normal pace during the evaluation; however, Dr. Spray noted that Plaintiff may be distracted by internal dialogue.

On August 10, 2010, Plaintiff was seen by Dr. Robin L. Ross. (Tr. 305). Dr. Ross' notes reflect Plaintiff's five-year history of severe mood swings and racing thoughts. Plaintiff was noted to be taking Seroquel, which may have been causing some swelling in her lower extremities. Dr. Ross recommended tapering off the Seroquel, and slowly changing Plaintiff's medication.

On August 11, 2010, Plaintiff presented at River Valley Musculoskeletal Center with complaints of lower leg pain just below the knee. (Tr. 399). After examining Plaintiff and taking x-rays of her left knee, Dr. Thomas Cheyne diagnosed Plaintiff with a probable partial tear, left gastrocnemius. Dr. Cheyne recommended general stretching, light activity, and that Plaintiff remain off work for two weeks.

Dr. Ross' August 17, 2010, notes reflect that Plaintiff was having trouble sleeping. (Tr. 306). Plaintiff was alert and oriented and had a better mood and affect. Dr. Ross' notes also reflect Plaintiff was completely off Seroquel. Plaintiff reported that another doctor opined that the swelling was caused by Plaintiff's work, and that Plaintiff was off of work until the 25th.

On August 23, 2010, Plaintiff phoned Dr. Ross' office, reporting that she was feeling very depressed and tearful. (Tr. 307). She stated that Dr. Ross had taken her off of Seroquel, but that her primary care physician thought the Seroquel was not the cause of the swelling in her extremities. She reported that she was confused and did not know what to do. Dr. Ross recommended Plaintiff take Abilify.

On August 25, 2010, Plaintiff reported that she had not seen much improvement in her left knee. (Tr. 398). Plaintiff's MRI of her knee was normal; however, Dr. Cheyne

4

recommended another MRI of her lower leg if she did not improve soon.  He suggested she remain off work for another three weeks.

On August 26, 2010, Plaintiff reported that she was not sleeping, and that she did not feel like doing anything. (Tr. 307). Plaintiff reported that she was unable to complete activities of daily living, and requested to be placed back on Seroquel.  Dr. Ross started Plaintiff back on Seroquel.

On September 15, 2010, Plaintiff saw Dr. Cheyne with continued complaints of pain in her left knee. (Tr. 397). Dr. Cheyne suggested Plaintiff see Dr. Steven Smith for an evaluation of her knee.  Dr. Cheyne recommended that Plaintiff remain off work.

On September 28, 2010, Dr. Ross' notes reflect that the Seroquel was working well for Plaintiff. (Tr. 307). Her notes also reflect Plaintiff's significant leg pain, and that Plaintiff would see a surgeon later in the week.

On October 1, 2010, Dr. Smith's notes reflect that he administered an injection in Plaintiff's left knee.  His notes also reflect that a MRI showed fluid signal at the patellar retinaculum. At a follow up visit on October 11, 2010, Plaintiff reported that the injection did not help her pain, and Dr. Smith scheduled a left knee arthroscopy.  (Tr. 395). On October 19, 2010, Plaintiff underwent a left knee arthroscopy and resection of the suprapatellar plica and debridement of the anterior fat pad performed by Dr. Smith. (Tr. 376).

On October 29, 2010, Plaintiff was seen by Patrick Walton, Physician Assistant, for a follow up on her left knee post-surgery. (Tr. 394). Plaintiff reported a lot of swelling. Plaintiff reported that her pain was being controlled with her medication, and that she was progressing with her therapy. Plaintiff was noted to be using crutches. Plaintiff's stitches were removed,

5

and she was instructed to continue with therapy. Mr. Walton recommended that Plaintiff be off work for six weeks.

On November 16, 2010, Plaintiff was seen by Dr. Smith for a follow up on her left knee arthroscopy. (Tr. 393). Dr. Smith noted that Plaintiff was complaining of pain. Plaintiff reported that she did not think she could return to work in two weeks, and Dr. Smith suggested she return to see him in three to four weeks for a repeat examination.

On November 30, 2010, Plaintiff followed up with Dr. Ross. (Tr. 308). Plaintiff reported that the Seroquel was working well, but that she was experiencing knee pain after her surgery. Dr. Ross' notes reflect that Plaintiff could not work and maintain her mental health. Upon examination, Dr. Ross noted Plaintiff was alert and oriented, with good eye contact, and normal speech. Dr. Ross recommended Plaintiff remain on Seroquel and return in three months.

On December 16, 2010, Plaintiff reported that her left knee was buckling and giving way. (Tr. 392). Upon examination, Dr. Smith noted significant quadricep atrophy. Dr. Smith also noted that he counseled Plaintiff on rehab exercises, and thought Plaintiff had improved enough to return to work "later on." (Tr. 392). Plaintiff was also fitted with a brace. Plaintiff was to return as needed.

On December 20, 2010, Plaintiff was seen for a follow up for her left knee. (Tr. 391). Dr. Smith noted that Plaintiff had been seen the previous week, and at that time, Plaintiff was noted to have quad atrophy. Dr. Smith noted that he had discussed with Plaintiff that he thought Plaintiff's pain was due to her quad weakness. Dr. Smith opined that until Plaintiff regained her quad strength, she would continue to have pain. Dr. Smith also noted Plaintiff reported

having problems with her brace, so Plaintiff was counseled on the use of her brace. Plaintiff's aunt was concerned about the possibility of Plaintiff developing MS, to which Dr. Smith responded there were no indications of MS. Dr. Smith noted that a MRI of the lumbar spine might rule out a herniated disc as the cause of Plaintiff's pain. Dr. Smith also noted Plaintiff's request for a second opinion and that Plaintiff could certainly obtain this from Dr. Buie. Plaintiff was noted to be able to remain off work until January 5th, when Plaintiff was to see Dr. Buie.

On February 12, 2011, Plaintiff was seen at Sparks Regional Medical Center for a lingering headache caused by a previous fall. (Tr. 346). A CT of Plaintiff's head was normal and Plaintiff was discharged in stable condition. (Tr. 351).

On November 8, 2011, Plaintiff was seen by her primary care physician for swelling in the left thigh and abnormal weight gain. (Tr. 335). During that visit, Plaintiff reported to Dr. Philip Elangwe that her mood was stable, but that the Seroquel was causing progressive weight gain. Dr. Elangwe noted that Plaintiff's psychiatrist was most likely keeping Plaintiff on Seroquel because Plaintiff was doing well. Dr. Elangwe noted her previous diagnosis of bipolar disorder, that she was stable on Seroquel, and that she was obese with continued weight gain. In January and February of 2012, Plaintiff was treated by Dr. Elangwe for symptoms of constipation, sore throat, left knee pain, reflux, insomnia, and cold intolerance. (Tr. 331-334).

On February 1, 2012, x-rays of Plaintiff's knee showed no fracture or dislocation; unremarkable soft tissues; and no acute osseous pathology. (Tr. 336).

On February 2nd and February 7th of 2012, Plaintiff was seen at Arkansas Western Counseling and Guidance Center by Dr. Terrell Bishop. (Tr. 413). On both occasions, Dr.

Bishop's notes reflect that Plaintiff had a normal mental status and was taking her medication as prescribed. Dr. Bishop's notes also reflect Plaintiff was not a risk to herself or others. Plaintiff's diagnosis was as follows: Axis 1: bipolar disorder, most recent episode manic, moderate, and Axis 2: diagnosis deferred.

In March of 2012, Dr. Bishop conducted a treatment plan review of Plaintiff. (Tr. 419-424). Dr. Bishop's notes provide the same Axis 1 and Axis 2 diagnoses. However, Dr. Bishop modified her diagnosis to include the following:

> Axis 3: Change in appetite, chronic pain problems, frequent or severe headaches, change in memory or concentration, depression, bipolar disorder, feeling as though brain were racing, anxiety or panic.
>
> Axis 4: 6 Economic Problems
>
>     4 Occupational Problems
>
> Axis 5: 51 Moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).

(Tr. 419). Dr. Bishop noted two targeted impairments. The first was unstable mood, with no improvement noted. The second was knowledge deficit regarding Plaintiff's diagnosis and how to deal with her symptoms, with improvement noted. The treatment plan reflects Plaintiff's medications were being adjusted as needed, and that without treatment Plaintiff was likely to revert back to her old behaviors. Dr. Bishop noted Plaintiff still needed services, and that day rehabilitation and therapy afforded her the opportunity to understand her symptoms, learn skills, and practice skills in a therapeutic setting.

On March 22, 2012, Dr. Bishop's notes reflect that Plaintiff was talkative, animated but free of overt psychotic symptoms; she was non-suicidal; and she was compliant with her medication. (Tr. 417). Dr. Bishop also recommended a treatment plan change of inpatient care.

In March of 2012, Plaintiff complained of increased sleepiness and a white patch on her tongue. (Tr. 329-330). Dr. Elangwe's notes reflect that a change in Plaintiff's medication left her feeling better. Plaintiff reported that she was active and able to do things, and that she, at the time, was feeling very pleased.

On May 7, 2012, Dr. Elangwe's clinic notes show that Plaintiff was having trouble sleeping, and that she was non-compliant with her medication. (Tr. 328). Dr. Elangwe advised Plaintiff to restart her medication and follow up with her psychiatrist.

On May 9, 2012, Plaintiff was seen at Vista Health for an outpatient psychiatric evaluation following a visit to the emergency room the day before with complaints of depression. (Tr. 319). During the evaluation, Plaintiff reported that she could not sleep. Plaintiff's mother reported that Plaintiff was not compliant with her medication, that she was not sleeping, that she was "mean," that she was easily frustrated, and that she could not stop talking. Medication nonadherence was added to Plaintiff's Axis 5 diagnosis. Outpatient therapy and medication management were recommended and her prognosis was noted as "fair." (Tr. 324).

On May 24, 2012, Dr. Bishop conducted a second treatment plan review, where he modified Axis 5 of Plaintiff's diagnosis to include severe symptoms of suicide or other things, or serious impairment in social, occupational or school functioning. (Tr. 427-428). Dr. Bishop noted minimal achievement of unstable mood, for which individual psychotherapy and medication was recommended.

In June of 2012, Plaintiff complained of not sleeping well. (Tr. 315-318). The Vista Health APN progress note indicated that Plaintiff had started on Invega injections, which had

slowed her mind down. Plaintiff was noted as doing well overall. In July of 2012, at Plaintiff's Vista Health outpatient psychiatric evaluation, it was noted that Plaintiff's mood was stable, her eye contact was good, she was easily engaged, she was calm, and her prognosis was good. In August of 2012, Plaintiff reported she was doing well, her mood was good, and she was a little irritable, but not as often. (Tr. 312). The notes indicated she was in therapy, and the therapy was producing good results.

On August 8, 2012, a Discharge Summary from Western Arkansas Counseling and Guidance Center indicates that while individual psychotherapy was recommended, Plaintiff had dropped out of treatment, and there had been no contact with Plaintiff for ninety days. (Tr. 435-440).

On October 23, 2012, Dr. Diane Kogut, a non-examining medical consultant, completed a mental RFC assessment stating Plaintiff had moderate limitations in the following areas: the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to sustain an ordinary routine without special supervision; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to respond appropriately to changes in the work setting; and the ability to set realistic goals or make plans independent of others. (Tr. 63-65). Dr. Kogut further states that Plaintiff has a history of noncompliance with her medication, that her recent medical records show improvement in her condition with medication, and that her limitations do not preclude unskilled work. Dr. Kogut concluded Plaintiff was able to perform work where interpersonal contact was incidental to work

10

performed; the complexity of tasks was learned and performed by rote, few variables, and little judgment; and the supervision required was simple, direct and concrete. On January 10, 2013, Dr. Dan Donahue, also a non-examining medical consultant, completed a mental RFC assessment, the results of which mirrored those of Dr. Kogut. (Tr. 91-93).

On October 26, 2012, Dr. Judith Forte, a non-examining, medical consultant, opined that Plaintiff did not have a severe physical impairment. (Tr. 61-62). On January 9, 2013, Dr. Dan Gardner affirmed Dr. Forte's assessment as written. (Tr. 89).

In October of 2012 and January, February and April of 2013, the Vista Health APN progress notes indicate Plaintiff's mood was good and she was doing well on Invega, with no current side effects. (Tr. 359, 442-444). In the February and April progress notes, Plaintiff reported problems with insomnia. (Tr. 442-443).

On June 28, 2013, Dr. Elangwe completed a Medical Source Statement.[2] (Tr. 449-453). On the form, it was indicated that Plaintiff was precluded from performance for fifteen percent or more of an eight-hour work day in the areas of understanding and memory, sustained concentration and memory, social interaction, and adaptation. It was also indicated that Plaintiff would be precluded from performing a job more than thirty percent of an eight-hour workday, five days a week, in a competitive work environment. Plaintiff, as a result of her mental limitations, would be absent from work five or more days a month, would be unable to complete an eight-hour work day five days or more out of the month, and would be less than fifty percent capable of performing a job eight hours a day, five days a week on a sustained basis. The form states that Plaintiff was unable to obtain and retain work in a competitive work

---

[2] The Medical Source Form is signed by Jena Miesner, LCSW, and Dr. Elangwe. Dr. Elangwe, Ms. Miesner, and Christine Sinclair, APN, all printed their names at the bottom of the form. (Tr. 453).

11

setting, eight hours a day, five days a week, for a continuous period of at least six months. The form also states that Plaintiff was able to manage benefits payments and notes that she was able to complete a basic budget for her own personal finances.

### III.  Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§

423(d)(3), 1382(3)(C).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

**IV.     Discussion:**

Plaintiff makes the following arguments on appeal: 1) the ALJ erred in failing to fully develop the record; 2) the ALJ erred in his credibility determination; and 3) the ALJ erred in determining Plaintiff's RFC.

### A.     Failure to Fully Develop the Record:

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir. 1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press her case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record.  "Reversal due to failure to develop the

record is only warranted where such failure is unfair and prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period. Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

### B.     Subjective Complaints and Credibility Analysis:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. The record reflects that during the relevant time period, Plaintiff reported that she was able to take care of her son; clean the house; cook dinner; do laundry and iron clothing; drive a car; go out alone;

14

shop in stores for clothing and shoes; attend her son's sporting events; and watch television, read, and do crafts. (Tr. 237-243). Moreover, Plaintiff reported that she was able to work at the same job for five years, and at the June 27, 2013, hearing before the ALJ, she testified that, despite some continuing issues with depression, she thought she would be able to work in a job setting where there was no significant contact with others. (Tr. 40, 298). Plaintiff also testified that while she still had manic episodes every six months, she had not had any manic episodes since beginning her current treatment (consisting of Invega injections), which medical records show she had undergone since June of 2012. (Tr. 35, 318). Nonexamining state agency medical consultants, Drs. Diane Kogut and Dan Donahue, found Plaintiff had only mild limitations in her activities of daily living and only moderate limitations in social interaction, concentration, persistence and pace. (Tr. 63-65, 91-93).

Although Plaintiff stated in her December of 2012 Function Report that after her knee surgery, she had complaints of knee pain and could not stand for long periods of time because of her knee pain, she testified at the hearing on June 27, 2013, that her knee was much better and that she could stand seven to eight hours without pain. (Tr. 44-46). Moreover, Plaintiff's last complaint of knee pain was in February of 2012, and the medical records do not reflect that any further surgery was discussed or recommended. (Tr. 331).

Although it is clear that Plaintiff suffers some degree of limitation, she has not established that she is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### C.     ALJ's RFC Determination and Weight of Physicians' Testimony:

RFC is the most a person can do despite that person's limitations. See 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. See Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In deciding whether a claimant is disabled, the ALJ considers medical opinions along with "the rest of the relevant evidence" in the record. 20 C.F.R. §§ 404.1527(b), 416.927(b). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007), citing Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (internal citations omitted).

The SSA regulations set forth how the ALJ weighs medical opinions. The regulations provide that "unless [the ALJ] give[s] a treating source's opinion controlling weight ... [the

ALJ] consider[s] all of the following factors in deciding the weight [to] give to any medical opinion": (1) examining relationship; (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and, (6) "any factors [the applicant] or others bring[s] to [the ALJ's] attention." 20 C.F.R. §§ 404.1527(c), 416.927(c). The regulations provide that if the ALJ finds "that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the applicant's] record,* [the ALJ] will give it controlling weight." *Id.* at §§ 404.1527(c)(2), 416.927(c)(2) (emphasis added).

In finding Plaintiff able to perform a full range of work with certain limitations, the ALJ considered Plaintiff's subjective complaints, the medical records of her treating and examining physicians, and the evaluations of the examining and non-examining medical providers. In making the RFC determination, the ALJ specifically addressed the consultative medical examination performed by Dr. Spray. (Tr. 297-301). The ALJ also considered the medical opinion of Plaintiff's psychiatrist, Dr. Ross, which stated generally that Seroquel was working well for Plaintiff, her speech was normal and goal-directed, and her mood was stable. (Tr. 306-308). Dr. Ross opined, however, that Plaintiff would not be able to work and maintain her mental health, which the ALJ found to be inconsistent with her own treatment notes as well as Plaintiff's testimony that she had been able to work for five years, being off work only occasionally for medical reasons or exacerbations of her bipolar symptoms. See Davidson v. Astrue, 501 F.3d 987, 990-91 (8th Cir. 2007) (finding ALJ correctly discounted a physician's assessment report when his treatment notes contradicted the report).

The ALJ also considered the opinion and medical records of another psychiatrist, Dr. Bishop, who diagnosed Plaintiff with bipolar disorder and prescribed Seroquel. (Tr. 413, 415, 417, 419-424, 427-428, 435-440). Dr. Bishop noted that Plaintiff's medication was being adjusted as needed and that she was learning to manage her anger to some degree while in treatment. He suggested continued treatment was needed and mentioned that Plaintiff was attending day rehabilitation. However, there are no medical records to show Plaintiff attended day rehabilitation, but rather, as of August of 2012, the records show that Plaintiff dropped out of treatment and had not been heard from in ninety days. The ALJ found Dr. Bishop's opinion deserved little weight as it was not supported by his own clinic notes.

The ALJ also determined that Dr. Elangwe's Medical Source Statement deserved little weight. In the Statement, Dr. Elangwe assigned Plaintiff severe mental limitations that would prevent her from working. (Tr. 449-453). This assessment was not consistent with the medical record as a whole, or with Dr. Elangwe's own medical records, which state that Plaintiff's mood was stable and her increased sleepiness had resolved with adjustments to her medication. (Tr. 329, 335). "Because [Dr. Elangwe's] determination contradicted other objective evidence in the record, the ALJ's decision to give less weight to [Dr. Elangwe's] determination was reasonable." Renstrom v. Astrue, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (citing Partee v. Astrue, 638 F.3d 860, 864 (8th Cir. 2011). See also Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) ("[W]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.") (internal quotation marks and citation omitted). Moreover, Dr. Elangwe's Medical Source Statement was a checkbox form. A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record. See Martise v. Astrue, 641 F.3d

909, 926 (8th Cir. 2011) (citing Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004)). The ALJ further notes that the Medical Source Statement was completed by Jena Miesner, rather than Dr. Elangwe.[3] Ms. Miesner is a Licensed Clinical Social Worker (LCSW). To the extent that Ms. Miesner was the author of the form, a LCSW is not an appropriate medical source. See 20 C.F.R. §§ 404.1513(a), 416.913(a) (A L.C.S.W. is not considered an "acceptable medical source" who can provide evidence to establish the existence of a medically determinable impairment or disability.).

Lastly, the ALJ gave great weight to the nonexamining state agency medical consultants, Drs. Kogut and Donahue. In their mental RFC assessments, they opine that Plaintiff was able to perform work where interpersonal contact was incidental to work performed; the complexity of tasks was learned and performed by rote, few variables, and little judgment; and the supervision required was simple, direct and concrete. (Tr. 63-65, 91-93). As a result, these opinions are reflected in the ALJ's RFC determination.

The ALJ also took Plaintiff's obesity into account when determining Plaintiff's severe impairments. Heino v. Astrue, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim process, such review may be sufficient to avoid reversal). Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

### D.  **Hypothetical Question to the Vocational Expert:**

After thoroughly reviewing the hearing transcript, along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set

---

[3] The form contains the printed names of Jena Miesner, LCSW, Christie Sinclair, APN, and Philip Elangwe, and the form is signed by Dr. Elangwe and Jena Miesner. (Tr. 453).

19

forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that, during the relevant time period, Plaintiff's impairments did not preclude her from performing jobs that exist in significant numbers in the national economy, such as machine tender and inspector, both of which are at a light exertional level. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.     Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 18th day of April, 2016.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE